# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DONNA L. LEWIS,                               )
                                              )
      Plaintiff,                          )
                                              )
      v.                                  )     **No. 04 C 6050**
                                              )
CITY OF CHICAGO POLICE                        )
DEPARTMENT, CITY OF CHICAGO, and )     **Judge Ruben Castillo**
TERENCE WILLIAMS, in his individual           )
capacity,                                     )
      Defendants.                         )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Donna Lewis, sued the City of Chicago ("City") and the City of Chicago Police Department ("CPD")[1] for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* In addition, Lewis sued the City, the CPD, and her supervisor, Terence Williams (collectively, "Defendants") under Section 1983 for sex discrimination and First Amendment retaliation. On March 15, 2005, this Court granted Defendants' motion to dismiss Lewis's claim for First Amendment retaliation.[2] (R. 24.) Defendants now move for summary judgment on the remainder of Lewis's counts against them. (R. 71, Williams' Mot. for Summ. J.; R. 75, City and CPD's Mot. for Summ. J.)

Lewis alleges that Defendants discriminated against her on the basis of her gender

---

[1]Lewis names both the City and the CPD as parties because the CPD is not a suable entity separate from the City. *Chan v. Wodnicki*, 123 F.3d 1005, 1007 (7th Cir. 1997); *West by & Through Norris v. Waymire*, 114 F.3d 646, 646-647 (7th Cir. 1997). Therefore, the City is named because it is the real party in interest.

[2]Lewis asks this Court, in a footnote, to reconsider its March 15, 2005, ruling dismissing her First Amendment retaliation claim under Section 1983 without prejudice. Since she has not properly filed a motion before this Court, the Court will not reconsider this claim.

because Williams refused to send her on a special assignment in Washington, D.C. Lewis claims that Williams retaliated against her and harassed her because she publicly complained about his purported sexually discriminatory practices. Williams allegedly harassed Lewis and purposely placed her in a situation where she was injured during the course of her duties. Lewis claims that the CPD ignored her complaints of discrimination and retaliation.

## RELEVANT FACTS[3]

### I.    The Washington, D.C. Special Assignment

Lewis graduated from the Chicago police academy in 1998. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 6.) She was assigned to the Third District where she performed general police work. (*Id.*) In September 2000, Lewis joined the tactical unit ("TACT") in the Third District, where her job routinely involved dealing with drug dealers and gang members. (*Id.* ¶ 8.) In June or July 2002, Williams became the Tactical Lieutenant in the Third District. (*Id.* ¶ 10.) While in TACT, Lewis reported to Sergeant Fred Melean ("Melean") who reported directly to Williams. (*Id.*) When Lewis was transferred to the Gang unit, she reported to Sergeant Robert Goode ("Goode") who reported directly to Williams. (R. 95, Pl.'s Facts, Ex. 44, Goode Dep. at 18.)

In September 2002, the Washington, D.C. Police Department requested help from other police departments to assist with anticipated demonstrations at a meeting of the International Monetary Fund ("IMF"). (*Id.* ¶ 11.) Lewis applied for the special assignment ("IMF detail"). (R. 95, Pl.'s Facts ¶ 6.) James A. Maurer, CPD's Chief of Patrol, issued a memorandum on the requirements for officers to attend the IMF detail ("IMF Memo"). (*Id.*, Ex. 30, IMF Memo.)

---

[3]These facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1(b). Unless otherwise indicated, the facts included herein are undisputed.

According to the IMF Memo, to qualify for the IMF detail, an officer had to be either tactical, gang, or S.O.S. personnel and on furlough[4] or regular day off in groups 6 or 7.[5] (*Id.*) Furthermore, the IMF Memo specified that because hotel accommodations require two persons to a room, a lone female officer would not be sent. (*Id.*, Ex. 30, IMF Memo.)

After Lewis expressed interest, Melean placed Lewis on the list to attend the IMF detail. (R. 95, Pl.'s Facts ¶ 11.) On September 16, 2002, Melean informed Lewis that Williams had taken her name off of the list of attendees. (*Id.* ¶ 13.) Williams claims that he told Lewis that she could not attend because he did not have another female officer to send. (R. 100-1, Defs.' Resp. to Pl.'s Facts ¶ 16.) Lewis claims that when she spoke with Williams directly about removing her from the list, he told her that he removed her from the list because she is female. (R. 95, Pl.'s Facts ¶ 16.) No female officers from the Third District participated in the IMF detail. (R. 100-1, Defs. Resp. to Pl.'s Facts ¶ 17.) Odd numbers of male officers were allowed to attend the IMF dtail and were paired with male officers from other districts. (*Id.* ¶ 22.)

On September 26, 2002, Lewis filed a grievance with her union alleging that the CPD discriminated against her by not allowing her to attend the IMF detail because she is a woman. (*Id.* ¶ 14.)

## II.    The CAPS Complaints

On September 20, 2002, Williams ordered Lewis to investigate a Chicago Alternative

---

[4]The CPD refers to vacation time as a "furlough."

[5]The parties do not define what it means for an officer to be in "regular day off in groups 6 or 7", but it is not material to the resolution of this motion.

Policing Strategy ("CAPS")[6] complaint about narcotics. (R. 95, Pl.'s Facts ¶¶ 47- 48.) Williams

told her that she should call over the radio for a marked uniformed car if she needed back up.

(Id. ¶ 49.) Investigating a CAPS complaint falls within Lewis's job description as a TACT

officer. (Id., Ex. 4, Lewis Dep. at 98.) By the time Lewis finished reviewing the CAPS

complaint, another officer had returned to the station and went with Lewis to investigate the

CAPS complaint. (Id. ¶ 55.)

On or about October 4, 2002, Lewis submitted a request for an extension of time to

complete the September 30th CAPS complaint and indicated that Officer Wallace would

continue to investigate while she was on furlough from October 9, 2002, until November 1,

2002. (Id. ¶ 58; Id., Ex. 4, Lewis Dep. at 147-48.) Williams approached her in the TACT office

and threw the request across the table stating, "Tell Fred [Wallace] this is not good enough." (Id.

¶ 59.) On October 8, 2002, Williams allegedly returned the same complaint to Lewis again. (Id.)

While Lewis was on furlough, Melean submitted the CAPS complaint for her and it was returned

to her on November 1, 2002. (Id. ¶ 65.) Defendants deny that the CAPS complaint was returned

on November 1, 2002, and state that Lewis had not completed her investigation at that time. (R.

100-1, Defs.' Resp. to Pl.'s Facts ¶ 65.) After Lewis returned from furlough, she investigated the

complaint further, making arrests and collecting money and drugs, but the complaint was

returned again. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 152.) The parties dispute which

supervisor returned the complaint to Lewis for correction on November 12, 2002, but the

complaint was finally accepted on November 13, 2002, after Lewis included a more detailed

---

[6]A CAPS complaint is a complaint from a citizen about a problem within the community.
*Brown v. City of Chicago*, 8 F. Supp. 2d 1095, 1103 (N.D. Ill. 1998) (discussing the CPD's
CAPS program); *see also* R. 95, Pl.'s Facts, Ex. 16, Williams Dep. at 197.

report. (R. 100-1, Defs.' Resp. to Pl.'s Facts ¶¶ 69, 71.)

On December 6, 2002, Williams assigned Lewis another CAPS complaint to investigate. (*Id.* ¶ 78.) Lewis investigated the complaint with a partner and turned in a report that was accepted without being returned for corrections. (R. 74, Def.'s Facts ¶ 67.)

## III.   The "Shots Fired" Call

On or about October 4, 2002, Williams assigned Lewis to a "shots fired" call, which according to Lewis, is contrary to normal practice and procedure. (R. 95, Pl.'s Facts ¶ 88.) It is undisputed that investigating a "shots fired" call is a task that falls within Lewis's job as a TACT officer, that Lewis had been assigned a "shots fired" call prior to the incident in question, and Williams had the authority to assign the "shots fired" call to Lewis. (R. 94, Pl.'s Resp. to Def.'s Facts ¶¶ 47-48.) At the time Lewis was assigned the "shots fired" call, she and her partner were already in the process of responding to the same "shots fired" call. (*Id.* ¶ 50.)

## IV.   Lewis' Transfer to the Gang Unit

On or about January 9, 2003, Williams transferred Lewis out of the TACT Unit and placed her in the Gang Unit with a new partner named Darin Macon. (R. 95, Pl.'s Facts ¶ 95.) Lewis did not trust Macon and another officer allegedly warned her prior to her transfer that she should "watch herself" because Macon "want[ed] to go back to the watch" and Williams "asked him (Macon) to do him this favor." (*Id.* ¶ 102.) There is no evidence that Macon failed to perform his duties as a police officer. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 70.)

Lewis is described as a "working officer" who "has [] activity, goes out and make[s] arrests, is a good copper," and she has received many commendations. (R. 95, Pl.'s Facts ¶ 99; *Id.*, Ex. 13, Rosebrach Dep. at 97.) Nonetheless, Williams stated that he transferred her because

her narcotics numbers were low. (*Id.* ¶ 105; *Id.*, Ex. 16, Williams Dep. at 116.) Melean testified in his deposition that he told Williams that he did not see any problems with Lewis's activity and disagreed with Williams about the transfer. (*Id.*, Ex. 11, Melean Dep. at 37.)

## V.    Lewis's Request to Special Operations is Denied

Lewis complained to one of her supervisors, Commander Rosebrach, about being unhappy under Williams's command. (R. 95, Pl.'s Facts ¶ 124; *id.*, Ex. 13, Rosebrach Dep. at 91.) Rosebrach informed her that he would try to remove her from under Williams's command and encouraged her to apply to the Special Operations Section ("S.O.S").[7] (*Id.*) On January 10, 2003, Lewis applied for a transfer to the S.O.S. (*Id.* ¶ 124.) Frank Radke, Deputy Chief of Special Operations, originally approved Lewis's request for a transfer, but her transfer request was ultimately denied.[8] (*Id.* ¶¶ 125-26; R. 94, Pl.'s Resp. to Defs.' Facts ¶ 74.) Lewis did not suffer any monetary harm as a result of not being transferred to S.O.S. because her pay would have been the same. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 197.)

## VI.    Lewis's New Partner

On or about February 6, 2003, Williams paired Lewis with a new partner, Officer Shepard Heard, because her previous partner, Macon, left the Gang Unit. (*Id.* ¶ 147; R. 74, Defs. Facts ¶ 77.) Lewis complained to Melean that she did not feel safe working with Heard, who

---

[7]Rosebrach had also tried to settle Lewis's grievance about the IMF detail by offering her the overtime pay she missed by not going on the assignment, but the union withdrew the grievance after Lewis filed her civil suit. (*Id.*, Ex. 13, Rosebrach's Dep. at 136, 147.)

[8]The parties dispute who denied Lewis's transfer request. Lewis claims that her transfer was approved by Commander Dugan, but "her transfer was blocked by an African American Chief" at the request of Williams. (R. 95, Pl.'s Facts ¶ 125-26, 128.) Defendants deny this, stating only that Lewis was not transferred to S.O.S. (R. 100-1, Defs.' Resp. to Pl.'s Facts ¶ 127.)

was rumored to have numerous brutality complaints against him. (R. 95, Pl.'s Facts ¶¶ 148, 150; *Id.*, Ex. 11, Melean Dep. at 34-35.) Lewis admits that she got along with Heard and believed that he was qualified to be a police officer. (*Id.*, Ex. 4, Lewis Dep. at 251-52.) She also states that nothing about her job responsibilities changed when Heard became her partner. (*Id.*)

## V.    Lewis's Injury

On or about March 13, 2003, Lewis was called to the scene of a narcotics related call. (R. 95, Pl.'s Facts ¶ 161.) Lewis questioned the assignment because she was already en route to another call when a male voice came over the radio and directed dispatch to send Lewis to assist Narcotics. (*Id.* ¶ 169-170.) Lewis contacted her sergeant, Sergeant Goode, to confirm the assignment, and he directed her to assist on the narcotics call. (R. 94, Pl.'s Resp. to Defs. Facts ¶ 85.) In the course of the assignment, Lewis was hit in the head with a sledgehammer by another officer, Frank Gomez, as they were making a forced entry into a residence. (R. 95, Pl.'s Facts ¶ 162.) Gomez had his back to Lewis as he swung the sledge hammer, and on the backswing, the sledgehammer hit Lewis. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 90.) Lewis suffered multiple blunt head trauma and a fractured neck. (*Id.* ¶ 163.)

## VII.    Lewis' Surgery

Lewis has been on leave of absence from the CPD since the date of her injuries. (R. 95, Pl.'s Facts ¶ 216.) Lewis's personal doctors recommended that she have surgery to remove a sequestered bone fragment from her neck. (*Id.* ¶ 222.) Defendants have not yet decided whether

they will pay for the surgery.[9] (*Id.* ¶ 224.) Prior to the filing of Lewis's complaint, she never had a problem getting surgery or medical treatment. (R. 100-1, Defs.' Resp. to Pl.'s Facts ¶ 226.) Since the injury, Lewis has been unable to return to full duty. (*Id.* ¶ 227.)

## LEGAL STANDARDS

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inferences in favor of that party." *King v. Preferred Tech. Group*, 166 F.3d 887, 890 (7th Cir. 1999). Weighing evidence and making credibility decisions are jury functions, and it is not appropriate for a judge to assume those functions when deciding a summary judgment motion. *Anderson,* 477 U.S. at 255. Accordingly, we apply the summary judgment standard with special scrutiny to employment discrimination cases, where issues of intent and credibility often are paramount. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). "Inferences that are supported by only speculation or conjecture will not

---

[9]Defendants claim that the CPD cannot make a decision about Lewis's surgery until it has been advised whether a cystic lesion in Lewis's neck has been resolved. (R. 100-1, Defs.'s Resp. to Pl.'s Facts ¶ 224.) Lewis claims that the cyst has been removed, and the CPD still refuses to make a decision about her surgery. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 99.) She claims this is retaliation against her for complaining about the CPD's discriminatory practices. (R. 92-1, Pl.'s Resp. to City's Mot. for Summ. J at 5-6.)

defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) (internal citations omitted); *O'Neal v. City of Chicago*, 392 F.3d 909, 912 (7th Cir. 2004).

## ANALYSIS

### I. Title VII Claims

Lewis brought two claims under Title VII, one for sex discrimination and one for retaliation. Title VII of the Civil Rights Act of 1964 prohibits employers from treating employees differently on the basis of sex, 42 U.S.C. § 2000e-2(a)(1), and from retaliating against an employee if the employee opposes any practice deemed unlawful under the Act, 42 U.S.C. § 2000e-3(a). Lewis bears the ultimate burden of proving that her employment was adversely affected because of her sex and in retaliation for engaging in protected conduct. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). She may sustain this burden with either direct or circumstantial evidence of discriminatory intent. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If Lewis establishes a prima facie case of either sex discrimination or retaliation or both, the burden shifts, requiring Defendants to come up with a noninvidious reason for the adverse action. If Defendants cannot satisfy their burden, the Court will deny summary judgment. *Whittaker*, 424 F.3d at 647.

#### A. Sex Discrimination

Lewis alleges that Williams discriminated against her by not allowing her to attend the IMF detail because she is a woman and then retaliated against her for complaining about his discriminatory behavior. Lewis argues that she has direct evidence of discrimination because Williams allegedly told her that she could not attend the IMF detail because she is "female." (R.

95, Pl.'s Facts at 3.) "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005). Direct evidence of discrimination "essentially requires an admission by the decision-maker that his actions were based upon prohibited animus." *Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir. 2004).

Williams's comment must be considered in the context in which it was made. The IMF Memo, which Williams relied on for his decision regarding which officers would attend the IMF detail, states that: "[b]ecause of hotel accommodations, a lone female officer will not be sent since there are two (2) persons to each room. Therefore, recommend a minimum of two (2) female officers." (*Id.* at 30.) Williams stated that he told Lewis she could not go because he "didn't have another female to send, and the chief of patrol memo [IMF Memo] stated what it did, and [he] had more than enough volunteers."[10] (R. 74, Defs.' Facts, Ex. A, Williams Dep. at 40.) Williams's alleged statement that Lewis could not go on the IMF Detail because she was "female" cannot be characterized as direct evidence of discrimination without a presumption that gender is completely irrelevant to the IMF detail. The IMF Memo indicates that gender was relevant to the rooming arrangements.

Lewis can still rely on the indirect method of proof to establish a prima facie case of sex discrimination. *Rhodes*, 359 F.3d at 504. Lewis can establish a prima facie case of sex

---

[10]Lewis identified two other females whom she claims were qualified to attend the IMF detail—Donna Davis and Jackie Regan. However, Davis was not in the correct day off group to qualify for the assignment, and Jackie Regan was on furlough during the time of the IMF detail. Lewis further testified that she did not know if Davis had an interest in going on the IMF detail. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 68-70, 72.) Also, Regan never requested to attend the IMF detail because she was on another assignment. (R. 98, Restricted Docs., Ex. S2, Statement of Jackie Regan.)

discrimination through indirect evidence by demonstrating that: "(1) [she] was a member of a protected class; (2) [she] was performing her job satisfactorily; (3) [she] experienced an adverse employment action; and (4) similarly situated individuals were treated more favorably." *Id.*

Lewis has not demonstrated that she experienced an adverse employment action. In order for an adverse employment decision to be actionable under Title VII, it "must materially alter the terms and conditions of employment." *Whittaker*, 424 F.3d at 648. Lewis has not presented any evidence that being excluded from the IMF detail materially altered the terms and conditions of her employment. Lewis argues that the IMF detail would have netted her over $1,000 in overtime pay and provided her with experience necessary for promotional advancement and other special assignments. As to overtime pay, Lewis cannot prove that she suffered an adverse employment action. *See Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (stating that "the denial of a monetary perk . . . does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary"); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (finding that an employer's denial of overtime pay is not an adverse employment action). Lewis admitted that missing out on this assignment has not hindered her career with the police department in any way nor did the missed opportunity render her ineligible for other job benefits or special assignments. (*See* R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 82-85.) Furthermore, Lewis did not present any objective evidence that officers who attended the IMF detail or special assignments in general are more likely to be promoted than officers who did not attend. *O'Neal*, 392 F.3d at 912. Accordingly, Lewis did not suffer an adverse employment action and cannot demonstrate a prima facie case of sex discrimination through the indirect method.

11

**B.     Retaliation**

Lewis alleges that Williams retaliated against her after she filed a grievance regarding his

refusal to allow her to attend the IMF detail.  Lewis can establish a prima facie case of retaliation

by proving that: "(1) after lodging a complaint about discrimination, (2) only [she], and not any

otherwise similarly situated employee who did not complain, was (3) subjected to an adverse

employment action even though (4) [she] was performing [her] job in a satisfactory manner."

*Whittaker*, 424 F.3d at 647 (*citing Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640,

642 (7th Cir. 2002)).

Lewis alleges that Defendants retaliated against her by assigning her to investigate a

CAPS complaint without backup; assigning her to a "shots fired" call; returning her CAPS

reports and ordering her to repeatedly make changes to a report that she claims was more than

satisfactory; reassigning Lewis to partners who had bad reputations and whom she did not trust;

transferring Lewis to the Gang Unit; denying Lewis's request to be transferred to S.O.S.; and

placing Lewis in a dangerous situation where she was ultimately injured.[11]  The City contends

that Lewis's retaliation claim fails because none of these actions constitute a materially adverse

employment action.  The Seventh Circuit has held that the standards for an adverse employment

---

[11]Lewis attempts to use each of these incidents as evidence of adverse actions taken
against her both because of her gender and in retaliation for filing the grievance against Williams.
(R. 93, Pl.'s Resp. to Williams' Mot. for Summ. J. at 6.)  In fact, Lewis admits that the only
instance of sex discrimination is Williams's refusal to assign her to the IMF detail.  (R. 95, Pl.'s
Facts, Ex. 4, Lewis Dep. at 86-88.)  Consequently, the Court will consider each of these actions
as a part of its analysis of Lewis's retaliation claim only. *See Turgeon v. Premark Int'l*, 87 F.3d
218, 221 (7th Cir. 1996) (stating that in order to establish a sex discrimination claim, "a plaintiff
must show that gender played a part in an employment decision.").

12

action for retaliation claims under § 2000e-3(a) are much broader than those for discrimination claims under § 2000e-2(a). *Id.* at 648. "Section 2000e-3(a) is 'broader' than § 2000e-2(a) in the sense that retaliation may take so many forms, while § 2000e-2(a) is limited to discrimination 'with respect to [the worker's] compensation, terms, conditions, or privileges of employment.'" *Id.* (*citing Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)). In the retaliation context, an employer's action will violate section 2000e-3(a) if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

Lewis argues that Defendants' conduct (at least in totality) constituted an adverse employment action. However, the proper analysis at this stage is whether each instance of retaliation alleged by Lewis standing alone meets the criteria of the prima facie case under *McDonnell Douglas.* The court may consider the sum or totality of the evidence presented only in determining whether the plaintiff has established that a defendant's explanation of conduct is pretextual. *Futrell v. J.I. Case*, 38 F.3d 342, 346 (7th Cir. 1994); *Wittenberg v. Wheels, Inc.*, 963 F. Supp. 654, 663 (N.D. Ill. 1997).

### 1. The CAPS complaints and the Shots Fired Call

Lewis argues that Williams violated policy and procedure when he ordered her to investigate the CAPS complaint without a partner. It is evident from the facts in evidence that Williams never told Lewis to investigate the complaint alone. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 98.) He told her that if she needed backup to call over the radio for a marked uniform car, and in fact, Lewis ended up investigating the complaint with a partner. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 41.) Williams has also instructed Lewis to investigate other complaints in the past, prior to her allegations of discrimination. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 101.)

Furthermore, Williams's instructions to Lewis to change her CAPS reports do not rise to the level of an adverse employment action. The record indicates that other officers had their CAPS reports returned to them, and at most, this constituted a mere temporary inconvenience. (*Id.*, Ex. 11, Melean Dep. at 77; R. 94, Pl.'s Resp. to Defs.' Facts ¶ 55.) "Not everything that makes an employee unhappy qualifies as an adverse action for Title VII." *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (citations omitted). While the demands that she change her CAPS report may have annoyed Lewis, she presents no evidence that demonstrates that the demands were unjustified.

Similarly, Lewis alleges that being assigned a shots fired call by Williams was contrary to practice and procedure. Williams came over the radio and told the dispatcher to send "362 Charlie" to investigate the "shots fired" call. (R. 95, Pl.'s Facts ¶ 91.) Lewis alleges that Williams knew that "362 Charlie" was the car assigned to Lewis that day. (*Id.*) However, Lewis had been assigned a "shots fired" call prior to the incident in question and Williams had the authority to assign the "shots fired" call to her. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 47-48.) Lewis further acknowledges that she and the other two officers with whom she was working that day were already en route to answer that particular "shots fired" call when she received Williams's order. (R. 95, Pl.s' Facts, Ex. 4, Lewis Dep. at 129.) Accordingly, she cannot claim that this task was completely beyond the scope of her job duties. While Lewis may have considered this task undesirable, a task that falls within an employee's job description is not an adverse employment action. *See Rhodes*, 359 F.3d at 505 (stating that the assignment of undesirable duties is not an adverse employment action, especially when within the employee's job description).

14

### 2. The Partner Reassignments, the Gang Unit Transfer, and the Denial of the S.O.S. Transfer

Lewis argues that the partner reassignment, the gang unit transfer, and the denial of her S.O.S. transfer request amount to adverse employment actions. Lewis alleges that Williams reassigned her to partner with Macon because Macon was not making a lot of arrests, which would affect her statistics as a result and give Williams a reason to "dump" her. (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 70.) Lewis admits, however, that she is not aware of any instances that in which Macon failed to perform his duties as a police officer. (*Id.*) Williams later transferred Lewis to another partner, Heard. Lewis admits that she got along well with Heard, believed he was qualified to be a police officer, and admits that nothing about her job assignment changed when Officer Heard became her partner. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 248, 251-252.) Given Lewis's admissions, it is clear that the partner reassignments do not constitute adverse employment actions.

Lewis argues that her transfer to the Gang Unit constitutes an adverse employment action because "the chances of overtime were less, the assignments were less adventurous, and [she] would have less opportunity for details (special assignments)." (*Id.*) Lewis offers only speculation as a basis for these assertions, which is insufficient to defeat a motion for summary judgment. *O'Neal*, 392 F.3d at 912. While an adverse employment action does not have to be easily quantifiable and indeed is a more fluid concept in the retaliation context, Lewis has not presented any evidence that Williams instituted a change that affected her base salary, benefits, basic duties, or career prospects. *Compare Collins v. State of Illinois*, 830 F.2d 692, 703 (7th Cir. 1987) (finding an adverse employment action where the employee was placed in a new

department without identifiable duties, her office was taken away from her, she was assigned to a desk outside her supervisor's office, and she also lost her phone, business cards, and listing in professional directories and publications); *Dahm v. Flynn,* 60 F.3d 253 (7th Cir. 1994) (holding that "a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action . . . .") In her deposition, Lewis testified that she was still responding to the same type of calls, that her benefits did not change, that she was never denied overtime, and that she still worked out of the same station. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 177-81.) A transfer involving no reduction in pay and no more than a minor change in working conditions is insufficient to establish an adverse employment action. *O'Neal,* 392 F.3d at 911-912.

Lewis also alleges that Deputy Chief Shields, prompted by Williams, blocked her transfer to S.O.S. Lewis argues that similarly situated male employees, including Lewis's former partner Angel Oliver, who did not complain about Williams's discriminatory conduct and who had less seniority than Lewis were transferred to S.O.S. (*Id.*) Defendants, however, assert that Lewis was not transferred because of manpower issues in the Third District.[12] It is well established that transfers that involve only minor changes in working conditions are not usually adverse employment actions, *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996); therefore, it would be unusual for this Court to hold that the denial of a transfer is an adverse employment action, especially when the transfer was essentially a lateral transfer—involving no

---

[12]Another officer, Turner Goodwin, was also transferred to S.O.S., but his transfer request was originally denied and later approved. (R. 95, Pl.'s Facts ¶ 134.) Lewis argues that Goodwin was never told that his request was originally denied because of "manpower issues," which was the reason given to Lewis for denying her request for a transfer. (*Id.* ¶ 137.)

change in pay; few changes in working conditions; and was not the sort of denial that would dissuade a reasonable employee from making a charge of discrimination.[13] *Washington*, 420 F. 3d at 661.

### 3. Ostracization by Co-Workers

Lewis argues that her co-workers began to ostracize her once it became clear that Williams was retaliating against her. Lewis states that because of Williams's retaliation, other officers, including her partner, did not want to associate with her for fear of retribution. (R. 95, Pl.'s Facts ¶ 83.) Lewis further alleges that she repeatedly complained to her supervisors that Williams' behavior was causing other officers to ostracize her, but nothing was done in response to her complaints. (*Id.* ¶ 86.) Lewis provides no evidence other than her own perceptions to support this allegation, basically stating that her relationship with her co-workers "significantly changed, and at some point or another, each one of those guys had an opinion or comment on the situation." (*Id.*, Ex. 4, Lewis Dep. at 120-121.) "An adverse employment action might occur when an employer orders its employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff." *Parkins v. Civil Constructors*, 163 F.3d 1027, 1039 (7th Cir. 1998). There is no evidence that Williams ordered Lewis's co-workers to shun her. We find that these actions do not amount to an adverse employment action. *Id.* (*citing Manning v.*

---

[13]Lewis further argues that she is entitled to an adverse inference that Defendants either intentionally withheld or destroyed documents because Defendants' failed to produce the transfer forms from January 2003, which would have shown that she applied for and did not receive a transfer to S.O.S. (R. 95, Pl.'s Facts ¶ 145.) She argues that there were no transfer forms produced for December 2002, or January, February, and March 2003, despite the fact that these documents would impeach Defendants' claim that there were no officers transferred from the Third District because of "manpower" issues. (*Id.*) This claim is irrelevant because the transfer denial does not constitute an adverse employment action.

*Metropolitan Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir. 1997)). Lewis does not point to any other evidence in the record that the actions of her co-workers caused any type of material harm actionable under Title VII.

### 4. Lewis's Injury on Duty, Lewis's Return to Active Duty, and the City's Decision Regarding Lewis's Surgery

Lewis argues that Williams orchestrated the events of March 13, 2003, in an attempt to have Lewis seriously injured or killed. (R. 95, Pl.'s Facts ¶ 160.) Lewis has presented no evidence to support this serious allegation. First, there was no evidence that Williams ordered Lewis to respond to the scene of the narcotics call. Lewis states only that "a male voice came over the radio" and she "believed the male voice was defendant Williams." (R. 94, Pl.'s Resp. to Defs.' Facts ¶ 83.) In fact, Lewis contacted Sergeant Goode in response to the radio call, who directed her to assist on the narcotics call. (*Id.* ¶ 85.) Second, according to Lewis's deposition testimony, she was struck in the head with a sledgehammer on the backswing—meaning that Officer Gomez, who was wielding the sledgehammer, had his back to her as he tried to open the door—as she stepped up on a porch. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 211.) There is no evidence that Officer Gomez acted with the intent to specifically injure Lewis, especially since he had his back to her as he was swinging the sledgehammer. Her assertion that Defendants engineered this scenario is based on pure speculation, which is insufficient to defeat summary judgment. *Waite v. Bd. of Trs.*, 408 F.3d 339, 346 (7th Cir. 2005) (stating that an unsubstantiated claim is insufficient to create an issue of material fact). There is absolutely no evidence that demonstrates that Williams is responsible for Lewis being hit with a sledgehammer. Indeed, there is no evidence that suggests that the sledgehammer incident was anything other than an

accident.

Lewis also argues that following her injury, the City ordered her to return to work in spite of the fact that her neck was still fractured and refused to make a decision about whether to pay for her surgery, in retaliation for her complaints about discrimination. Even under the broader provisions of section 2000e-3, Lewis has failed to establish a prima facie case of retaliation. Lewis cannot point to any comparable officers who were treated differently than Lewis with respect to returning to active duty after an injury or receiving a decision from the City about a surgical procedure. Therefore, her claim of retaliation fails. *Whittaker*, 424 F.3d at 647.

## C.   Hostile Work Environment

Lewis argues in her response brief that Defendants' actions resulted in a hostile work environment actionable under Title VII. This claim, however, is not alleged in Lewis's complaint. A plaintiff cannot amend her complaint with a brief that she later files in the case. *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993) ("If a complaint fails to state a claim even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint."). Furthermore, the hostile work environment claim is not contained in her EEOC charge and cannot be reasonably inferred from the allegations of sex discrimination and retaliation contained therein. *Cheek v. Western & S. Life Ins. Co.*, 31 F.3d 497, 503 (7th Cir. 1994) ("When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge.").

19

Relying on *Knox v. Indiana*, 93 F.3d 1327 (7th Cir.1996), Lewis attempts to argue that her retaliation claim can encompass a hostile work environment claim. This case, however, does not stand for the proposition that a plaintiff can omit a hostile work environment claim from her EEOC charge and her complaint, and later attempt to include this separate cause of action as a part of her retaliation claim. *Knox* stands for the proposition that an employer can be liable for a worker's retaliatory actions that might violate Title VII, such as "discrimination, harassment, or retaliation." *Id.* at 1334. A plaintiff who is not alleging this type of derivative liability still has to first plead her cause of action as a part of the EEOC charge and then subsequently in her complaint. Consequently, this Court will not consider Lewis's hostile environment claim.

## II.     Section 1983 Claims

### A.     Municipal Liability Claims Against the CPD and the City

Lewis alleges that the City of Chicago had a custom and policy of discriminating against women and retaliating against those who complained about discrimination in violation of Section 1983. In order to state a claim under Section 1983, Lewis "must allege that the defendants deprived [her] of a right secured by the Constitution or laws of the United States, and that the defendants acted under color of state law." *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (*citing Brokaw v. Mercer County*, 235 F.3d 1000, 1009 (7th Cir. 2000)). Municipal liability for a Section 1983 violation is governed by *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), and its progeny. A court may not hold a government entity liable under Section 1983 unless the entity adopted a policy or custom that resulted in the deprivation of the plaintiff's constitutional rights. *See id.*, 436 U.S. at 694; *Bennett v. Roberts*, 295 F.3d 687, 699 (7th Cir. 2002). Lewis can prove the existence of a custom or policy in three ways: "proof of an

20

express policy causing the loss, a widespread practice constituting custom or usage that caused

the loss, or causation of the loss by a person with final policymaking authority." *Bennett*, 295

F.3d at 699.

### 1. Express Policy of Discrimination

Lewis argues that the IMF Memo is discriminatory on its face and represents an express

policy that causes a constitutional deprivation.[14] In her brief, Lewis provides little insight into

why this memo is discriminatory on its face. She cites generally to *Trans World Airlines v.*

*Thurston*, 469 U.S. 111 (1985); *City of Los Angeles Dept of Water and Power et al. v. Manhart*,

435 U.S. 702 (1978); and *Dominicak-Brutus v. Urban Prop. Servs. Co.*, 217 F. Supp. 2d 911,

919 (N.D. Ill. 2002), to support this proposition. Each of the policies at issue in *Trans World*

*Airlines* and *Manhart*, however, discriminated against two groups of individuals in the terms and

privileges of employment. *See Transworld*, 469 U.S. at 111, 120 ("Captains disqualified because

of age are not afforded the same 'bumping' privilege as captains disqualified for reasons other

than age, but instead must resort to the bidding procedures."); *Manhart*, 435 U.S. at 704, 723

(holding that even though women as a class lived longer than men, defendant employer's practice

of requiring female employees to make larger contributions to its pension plan than its male

employees violated Title VII).

The instant case can be distinguished on the facts. The only reference the IMF memo

makes with respect to gender are the rooming assignments. This is not a term or condition of

---

[14]Lewis denies the authenticity of the IMF Memo yet she relies on it as direct evidence of discrimination. (R. 92-1, Pl.'s Resp. to City's Mot. for Summ. J. at 4; R. 94, Pl.'s Resp. to Defs.' Facts ¶ 16.) Since she has failed to present an authenticated version of this document and in fact includes the same copy of the document in her submissions as that included by the Defendants, we will rely on that which is in evidence.

employment in which the employer is distinguishing unfairly between men and women nor can it be characterized as a constitutional deprivation. Most cases discussing this issue involve a bona fide occupational qualification (BFOQ) for gender based hiring, which is not applicable in the instant case, but is certainly comparable. The CPD was interested in protecting the privacy rights of male and female officers attending the IMF detail, and such segregation of the sexes is not unusual where there is a legitimate privacy interest. *See Int'l Union et al. v. Johnson Controls*, 499 U.S. 187, 206 n. 4 (1991) (suggesting in dicta that gender classifications may be appropriate in situations where privacy interests are implicated); *compare Norwood v. Dale Maintenance Sys.*, 590 F. Supp. 1410, 1421 (N.D. Ill. 1984) (holding that male gender is BFOQ for position of washroom attendant for men's washroom in office building).

Finally, Lewis relies on *Dominicak-Brutus* to support her argument. In that case, however, the plaintiff presented evidence that the two defendants stated that they had concerns about promoting women to management positions because of unreasonable concerns about their safety. *Dominicak-Brutus*, 217 F. Supp. 2d at 920. Lewis has not presented any evidence that the "no lone female officer, two people to a room" requirement was unreasonable on its face. The IMF Memo reflects a legitimate goal to ensure same sex sleeping arrangements rather than a patriarchal attempt to keep women away from danger in the course of their duties. This case does not support Lewis's contention that the IMF Memo is discriminatory on its face and is an express policy of discrimination.

### 2. Widespread Custom or Policy

Lewis argues that her repeated complaints of Williams's discriminatory actions were neither addressed nor remedied, and that this is evidence of the City's widespread custom and

22

practice of discrimination. To demonstrate liability under Section 1983, Lewis must show that the CPD customarily or habitually ignored complaints of racial discrimination or harassment. *Garrison v. Burke*, 165 F.3d 565, 572 (7th Cir. 1999). Lewis identifies several supervisors whom she allegedly complained to: Captain Kenneth Johnson, Lieutenant Marie Johnston, Commander Rosebrach, Melean, Tim Fallon, and Goode, and she contends that none of these individuals took any steps to remedy Williams's allegedly discriminatory conduct.[15] (R. 95, Pl.'s Resp. to Defs. Facts ¶¶ 229-35.) Lewis further alleges that the fact that no CR Complaint was initiated after she complained of Williams's behavior and this demonstrates the City's widespread custom and practice of ignoring complaints of discrimination. CPD policy required that a CR Complaint be initiated within one hour after a supervisor received a complaint of discrimination. (R. 100-1, Defs.' Resp. to Pl.'s Facts ¶ 237.) In this instance, a CR Complaint was not initiated against Williams until March 3, 2003, which was the day Lewis filed her complaint with the EEOC and six months after she initially complained about Williams's behavior. Lewis also provides an affidavit by another female officer, Centeria Moore-Powell, who states that she complained about discrimination to supervisors, and no steps were taken to remedy it.

The record does not indicate that the City has a habit or custom of ignoring complaints of gender discrimination. Lewis identifies several individuals to whom she allegedly complained to about Williams's discriminatory treatment. For some of them—specifically Captain Kenneth Johnson and Lieutenant Marie Johnston—she does not provide any documentation of what was

---

[15]Neither Johnson, Johnston, or Fallon were deposed or provided affidavits in this matter. Therefore, we must rely on Lewis's assertions of her interactions with these individuals.

said during these conversations, she does not indicate what action she expected these individuals to engage in upon hearing her complaints, nor does she point to any individuals who may have knowledge of these conversations. *See Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996) (when "the only possible source of notice to the employer . . . is the employee who is being harassed, she cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some possibility that she was being sexually harassed.") (citations omitted).

In fact, Lewis testified in her deposition that she did not recall discussing any specific instances of retaliation or discrimination that had occurred to her with Captain Johnson and that the dialogue between them was "very lax general conversation" because they had a comfortable relationship. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 339- 40.) Lewis had a similar relationship with Lieutenant Johnston, and Lewis testified that she never asked Johnston to do anything to help her with her complaints of discrimination and retaliation. (*Id.* at 352-53.) This testimony undermines Lewis's argument that she was complaining about discrimination or retaliation to either Captain Johnson or Lieutenant Johnston with the expectation that they would take steps to remedy the situation.

For the other supervisors that Lewis named, the Court was able to glean from attached deposition transcripts what actions were taken to try to remedy Lewis's situation. For example, when Lewis complained to Melean about Williams's refusal to allow her to attend the IMF detail because she is "female," Melean offered to check with the Fraternal Order of Police about Williams' behavior or told her that she could do it. (R. 95, Pl.'s Facts, Ex. 11, Melean's Dep. at 56-57.) In addition, Lewis testified that Melean told her to call the union and the EEOC about

Williams's behavior. (*Id.*, Ex. 4, Lewis Dep. at 361.) Melean was the only supervisor with whom Lewis discussed opening a CR Complaint, and it is not clear from the record whether he told her the CR Complaint would be taken care of when she filed a grievance or if he offered to help her file a CR Complaint. (R. 95, Pl.'s Facts, Ex. 11, Melean Dep. at 60; *Id.*, Ex. 4, Lewis Dep. at 371.) Even if Melean failed to file a CR Complaint pursuant to CPD policy, this is insufficient, especially in light of other actions he offered to take on Lewis's behalf, to establish liability under Section 1983. An isolated act of misconduct (*i.e.*, the failure to immediately initiate a CR Complaint) does not meet the threshold for municipal liability under Section 1983. *Powe v. Chicago*, 664 F.2d 639, 650 (7th Cir. 1981) ("The allegation of a single incident of unconstitutional conduct by a municipal employee usually does not establish a sufficient basis for suing the municipality.").

Other supervisors attempted to take action on Lewis's behalf. Lewis admits that she applied to S.O.S. at the direction of Commander Rosebrach, the director of Labor Affairs, who knew that she had been unhappy under Williams's command. (*Id.* at 15-16.) Rosebrach also noted that he tried to settle Lewis's grievance by offering her the overtime pay that she missed by not going on the assignment, but the union withdrew the grievance when Lewis filed her civil suit. (R. 95, Pl.'s Facts, Ex. 13, Rosebrach's Dep. at 136, 147.)

Lewis also claims that she complained to Tim Fallon, her union representative, about Williams's discriminatory actions. According to Lewis, Fallon indicated that he would communicate her concerns to Rosebrach. Lewis presents no evidence that Fallon did not do so, even stating that she believed Fallon when he indicated that he had spoken to Rosebrach. (*Id.*, Ex. 4, Lewis's Dep. at 368.) These facts do not indicate that the CPD has a practice or a policy

25

of ignoring complaints of discrimination.

Finally, Lewis alleges that she spoke with Sergeant Goode, her supervisor in the Gang Unit, on numerous occasions between January 2003 and March 2003 about the discrimination and retaliation she was experiencing from Williams. (R. 95, Pl.'s Facts, Ex. 4, Lewis Dep. at 353.) Goode, on the other hand, claims that she never complained to him about any retaliation or discrimination. (*Id.*, Ex. 44, Goode Dep. at 25.) It is clear from the record that she never asked him to initiate a CR Complaint. (*Id.*, Ex. 4, Lewis Dep. at 370.) Lewis's allegations that Goode ignored her complaints of discrimination, even if true, does not demonstrate that the City had a policy of "customarily or habitually" ignoring complaints of discrimination or retaliation. *Garrison*, 165 F.3d at 572. Holding the City liable for the actions of Goode would be the equivalent to finding the City liable under a theory of respondeat superior. *Smith v. Metropolitan Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1024 (7th Cir. 1997) (noting that the idea that "discriminatory personnel actions taken by an employer's agent may create liability for the employer" is an "unremarkable expression of respondeat superior").

Finally, Powell-Moore's affidavit is insufficient to show that the complained of conduct extends beyond Lewis's allegations because it only provides conclusory statements and general allegations that shed no light on the alleged policy. Fed. R. Civ. R. 56(e) (stating that affidavits

must "set forth specific facts showing that there is a genuine issue for trial").[16] We hold that Lewis has not met Section 1983's requisite threshold of "a pattern of conduct or a series of acts violative of constitutional rights . . . that raise an inference of municipal policy." *Powe*, 664 F.2d at 651; *see also Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994) (*citing Rodgers v. Lincoln Towing Serv., Inc.*, 771 F.2d 194, 202 (7th Cir. 1985) (stating that "[b]oilerplate allegations of a municipal policy, entirely lacking in any factual support that a city policy does exist, are insufficient.").

## C.    Section 1983 Claim against Williams

Lewis alleges that Williams discriminated against her on the basis of her gender in violation of the Equal Protection Clause of the Fourteenth Amendment. She brings this claim pursuant to Section 1983. Lewis claims that Williams's refusal to allow her to attend the IMF detail was motivated by her gender. Furthermore, Lewis argues that many of Williams's retaliatory actions were taken because of her gender, a claim for which she provides no support. *See* Part I.B. n.5. Lewis's Section 1983 claim for intentional sex discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment is subject to the same burden shifting analysis under *McDonnell Douglas* as her Title VII claim. *King v. Bd. of Regents of Univ. of*

---

[16]Even if we had not found Powell-Moore's affidavit insufficient on its face because of its conclusory language and vague accusations, we would exclude the affidavit because Lewis failed to identify Powell-Moore as a potential witness in her Rule 26(a) disclosures. Under Rule 26(a)(1)(A), parties are required to disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts." A party that fails to comply with Rule 26 is subject to Rule 37's provision that "a party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence . . . on a motion any witness . . . not so disclosed." *See Johnson v. United States*, 98 C 2572, 1999 WL 446694, *5 (N.D. Ill. June 23, 1999).

*Wisconsin Sys.*, 898 F.2d 533, 537-538 (7th Cir. 1990) (noting that the only difference between sexual harassment under equal protection and under Title VII is that the defendant must intend to harass under the Equal Protection Clause) (*citing Batson v. Kentucky*, 476 U.S. 79 (1986)).

Applying this test, Lewis cannot make out a prima facie case under either the direct or indirect methods. Williams was not the ultimate decision maker in making the IMF detail assignments, so his statement to Lewis that she could not attend the conference because she was "female" is not direct evidence of discrimination. *See Davis v. Con-Way Transp. Cent. Express Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (*quoting Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 600 (7th Cir. 2003)) (stating that "[a] decisionmaker is the person responsible for the contested decision."). Ultimately, Commander Brown made the decision about which officers would attend the IMF Detail, not Williams. (R. 95, Pl.'s Facts, Ex. 16, Williams' Dep. at 241; *Id.*, Lewis Dep. at 62-68.) The remainder of Lewis's claims about Williams's retaliation fail because as discussed in detail above, none of the actions of which she complained were taken because of her gender. Therefore, Lewis has not established a Section 1983 sex discrimination claim against Williams.

## CONCLUSION

The Court is sympathetic to the fact that Lewis's recent career at the CPD has been hampered by a series of unfortunate events. However, even after drawing all inferences in favor of Lewis, the record does not allow us to conclude that she has established that there is a genuine issue of material fact requiring resolution at a trial. She has not established a prima facie case of sex discrimination or retaliation under Title VII or for sex discrimination under Section 1983. For these reasons, we grant Defendants' motions for summary judgment in their entirety (R. 71-1; R. 75-1). The Clerk is directed to enter judgment for the defendants.

ENTERED:

Judge Ruben Castillo
United States District Court

**Dated:** April 6, 2006